IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 11-cv-01649-MEH-BNB

ROSE A. SANTISTEVAN,

       Plaintiffs,

v.

CITY OF COLORADO SPRINGS, a municipality;
RICHARD MYERS, in his official capacity as Colorado Springs Chief of Police;
JIMMY RODGERS, in his official and individual capacity;
PHIL GURNETT, in his individual capacity;
JACKSON ANDREWS, in his official and individual capacity;
KEN MOORE, in his individual capacity;
BRIAN MATTISON, in his individual capacity;
OWEN MCCORMACK, in his individual capacity;
JEFFERY KRAMMER, in his individual capacity;
MARCUS MILLER, in his individual capacity;
SCOTT ROBBLEE, in his individual capacity;
JOHN DAVID, in his individual capacity;
JASON HESS, in his individual capacity;
KIMBLE GINGRICH, in his individual capacity; and
OTHER UNKNOWN AGENTS OF THE  COLORADO SPRINGS POLICE DEPARTMENT, in
their official and personal capacities,

       Defendants.

---

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

---

**Michael E. Hegarty, United States Magistrate Judge.**

      Pending before the Court are two motions for summary judgment: (1) the City Defendants'

Motion for Summary Judgment [filed August 31, 2012; docket #126] filed by Defendants Richard

Meyers, Jimmy Rodgers, Jackson Andrews, and the City of Colorado Springs (collectively, the "City

Defendants"); and (2) the County Defendants' Motion for Summary Judgment Pursuant to Fed. R.

Civ. P. 56(c) [filed August 31, 2012; docket #127].  Both motions are fully briefed.  Additionally,

at Plaintiff's request, the Court heard oral argument regarding the aforementioned motions on

December 18, 2012. (Docket #147.)  For the reasons set forth below, the City Defendants' Motion

for Summary Judgment is **GRANTED** and the County Defendants' Motion for Summary Judgment

Pursuant to Fed. R. Civ. P. 56(c) is **GRANTED IN PART and DENIED IN PART**.

## BACKGROUND

### I.   Findings of Fact

The Court finds the following facts, some of which are stipulated by the parties and the

remainder viewed in the light most favorable to the Plaintiff, who is the non-moving party in this

matter.  The Court notes that several of the of the "Disputed Facts" Plaintiff asserts are not

supported by the record.  Thus, the Court excludes them from its findings.

### A.   The Investigation

1.   Sergeant Jimmy Rodgers ("Sergeant Rodgers") supervised a group of law enforcement

detectives, including Detective Phil Gurnett ("Detective Gurnett"), who investigated

narcotics related crimes in the Colorado Springs, Colorado area. (Stipulated)[1]

2.    In 2009, Detective Gurnett, an employee of the El Paso County Sheriff's Office, was

assigned to the Metro Vice Narcotics Team ("Metro VNI").  (*Id.*)

3.   Metro VNI is a co-located multi-agency task force staffed by the Colorado Springs Police

Department (the "CSPD"), the El Paso County Sheriff's Office ("EPSO") and other

smaller agencies.  The purpose of Metro VNI is to combat narcotics trafficking in the 4th

Judicial District.  (*Id.*)

---

[1]The term, "stipulated," refers to those facts asserted by Defendants and "admitted" by
Plaintiff or asserted by Plaintiff and "admitted" by Defendants.

4.      After Detective Gurnett was assigned to Metro VNI, he initiated the "Geez Luis" investigation. (*Id.*)

5.      Geez Luis was a unique investigation involving multiple agencies, including Metro VNI and the Federal Bureau of Investigation ("FBI"), which "umbrellaed" into a large scale investigation of a drug trafficking organization ("DTO").  (*Id.*)

6.      Metro VNI suspected that the DTO involved several members the La Familia-Surrenos gang (the "La Familia gang").  (*Id.*)

7.      Sergeant Rodgers suspected that Kirt Santistevan was a member of the La Familia gang. (Docket #126-1, 10.)

8.      On March 2009, Detective Gurnett received information from a confidential informant ("CI") that a person by the name of "Wicked" was supplying narcotics to Kirt Santistevan.  (Stipulated.)

9.      "Wicked" was known to Detective Gurnett and other individuals at the CSPD as a member of the La Familia gang involved in narcotics distribution.  (Docket #127, 9.)

10.     Further investigation revealed that "Wicked" was actually Jorge Perez.  (Stipulated.)

11.     Jorge Perez *aka* "Wicked" (hereinafter "Jorge Perez") had connections to Luis Vega *aka* "Tricky" (hereinafter "Luis Vega").  (*Id.*)

12.     Luis Vega was also involved in drug trafficking with members of the La Familia gang. (*Id.*)

13.     On March 18, 2009, at approximately 10:46 p.m., Detective Gurnett arranged for the CI to meet Kirt Santistevan in a McDonald's parking lot in Colorado Springs to purchase narcotics from Kirt Santistevan.  (*Id.*)

14.     During the transaction on March 18, 2009, Kirt Santistevan brokered a drug sale between Luis Vega and the CI.  (*Id.*)

15.     The CI purchased 8 grams of methamphetamine from Luis Vega for $275.00.  (*Id.*)

16.     After the March 18, 2009 transaction, police surveillance followed Kirt Santistevan to Jorge Perez's home. (*Id.*)

17.     Jorge Perez lived at 736 E. Cucharras, approximately one-half block west of 203 S. Prospect.  (*Id.*)

18.     On April 3, 2009, Detective Gurnett arranged a second narcotics transaction with Kirt Santistevan using the CI.  At approximately 1920 hours, the CI purchased 3.0 grams of methamphetamine directly from Kirt Santistevan for $275.00. (*Id.*)

19.     Kirt Santistevan and Luis Vega left the scene of the April 3, 2009 drug transaction in the same vehicle.  (*Id.*)

20.     At the request of detectives, and after obtaining probable cause, CSPD patrol officers stopped the vehicle and positively identified Kirt Santistevan and Luis Vega.  (*Id.*)

21.     At the time of the stop, officers discovered an outstanding traffic warrant for Kirt Santistevan.  They arrested him according to that warrant.  (*Id.*)

22.     In approximately June 2009, the FBI Southern Colorado "Safe Streets" Task Force became the lead agency partner in the investigation.  (*Id.*)

23.     Over the course of the investigation, Metro VNI detectives successfully purchased 258.4 grams of methamphetamine linked to Luis Vega and expended approximately $11,600 in "buy funds" to do so.  (*Id.*)

24.     On July 22, 2009, a judge issued an order authorizing a wiretap on Luis Vega's primary

4

phone number.  (*Id.*)

25.     During the course of the interceptions, detectives learned that a primary source of Luis

Vega's marijuana was Theresa Baltazar. (*Id.*)

26.     The wiretap on Luis Vega's phone was "up" and being monitored in the course of the

investigation until September 2009.  (*Id.*)

27.     On or about July 22-23, 2009, the wiretap recorded a phone call from Luis Vega's phone

number to the number provided by Kirt Santistevan as his home number at 203 S.

Prospect.[2]  (*Id.*)

28.     During the phone call, an unknown female stated, "Yeah, we're bugging."  (*Id.*)

29.     According to Detective Gurnett, the unknown female used other coded language

indicative of illegal narcotics use.  (Docket #127-3 at 43-44.)

30.     By June 2009, the investigation had shifted away from Kirt Santistevan and focused on

Luis Vega and Jorge Perez. (Stipulated.)

31.     During July 2009, law enforcement set up a pole camera positioned to record Jorge

Perez's home. The camera permitted officers to observe activity at Perez's home 24

hours a day.  Although 203 S. Prospect was also visible from the pole camera, it was

unclear whether it captured any entrance to the residence.  (Docket #127-1 at 71-73.)

32.     On July 23, 2009, Gurnett applied for and received judicial authority for an electronic

tracking device ("ETD") to be placed on Luis Vega's car for the purpose of tracking his

---

[2]The Court observes a discrepancy between Detective Gurnett's affidavit [docket #127-5] and the facts agreed to by the parties, as the affidavit indicates that the call originated from the phone of Jorge Perez. Because significance of the call arises from the statements of the unknown female participant, this discrepancy is not material.

movements.  (Stipulated.)

33.   A review of the EDT stop report for activity reveals that between July 23, 2009 and

August 20, 2009, the EDT reflected ten (10) stop reports by Luis Vega's vehicle at 203 S.

Prospect.  (*Id.*)

34.   Detective Gurnett cannot recall ever observing Luis Vega enter the residence at 203 S.

Prospect.  (Docket #127-3 at 75.)

35.   On July 27, 2009, intercepted phone calls revealed that Luis Vega was about to make

additional drug transactions.  (Stipulated.)

36.   After suspected drug transactions, Luis Vega drove to 203 S. Prospect and parked for a

period of time. (*Id.*)

37.   The only documented contact Luis Vega (or any of the other alleged co-conspirators) had

with 203 S. Prospect in August 2009 occurred August 20, 2009.  All that is known about

the stop is that it probably lasted more than two minutes.  (*Id.*)

B.    Relationship Between Plaintiff and Alleged Co-Conspirators

38.   Kirt Santistevan is the son of Plaintiff and her husband.  Plaintiff and her husband reside

at 203 S. Prospect. (*Id.*)

39.   Kirt Santistevan has a familial relationship with Luis Vega and Jorge Perez.  (*Id.*)

40.   Diana Baltazar is the daughter of Plaintiff and her husband.  She resides across the street

from Plaintiff at 749 Cucharras.  (*Id.*)

41.   Diana Baltazar has two daughters: Susie and Theresa Baltazar.  (*Id.*)

42.   Susie Baltazar lives with Jorge Perez at 736 E. Cucharras.  Jorge Perez and Susie

Baltazar are married by common law. (*Id.*)

6

43.     Theresa Baltazar lives with Luis Vega at 322 N. Farragut.  (*Id*.)

44.     Jorge Perez and Luis Vega have referred to each other as "cousins."  (*Id*.)

        C.      Preparation of the Warrants

45.     Upon expiration of the last wiretap warrant in September 2009, Metro VNI detectives

        determined the investigation had run its course and began to prepare search and arrest

        warrants.  (*Id*.)

46.     Metro VNI detectives identified sixteen (16) individuals for whom they believed

        probable cause for an arrest existed, including Luis Vega, Jorge Perez, Kirt Santistevan,

        Theresa Baltazar, and Demetrius Santistevan.  (*Id*.)

47.     Detectives also identified nine (9) residences for which they believed probable cause to

        search existed, including the homes of Luis Vega, Jorge Perez, Susie Baltazar, and Kirt

        Santistevan.  (*Id*.)

48.     When Kirt Santistevan was arrested in mid-August 2009, he listed his home address as

        203 S. Prospect.   (*Id*.)

49.     According to Plaintiff, Kirt Santistevan does not reside at 203 S. Prospect but does

        receive mail there.  (*Id*.)

50.     Detective Gurnett prepared the affidavit in support of the warrant for 203 S. Prospect.

        (*Id*.)

51.     Detective Gurnett is aware that drug dealers will often provide a mailing address in lieu

        of their true residence.  (Docket #127-3 at 36.)

52.     Although Detective Gurnett did not take additional steps to verify that Kirt Santistevan

        resided at 203 S. Prospect, the address was also targeted for a search based on contact

Luis Vega and Jorge Perez had with the residence.  (*Id.* at 38-39.)

53.    The affidavit also omits that the pole camera never captured Kirt Santistevan, Luis Vega, Jorge Perez, or any of the other alleged conspirators entering the residence at 203 S. Prospect. (Stipulated.)

54.    The affidavit prepared by Detective Gurnett fails to specify any contact by any member of the alleged conspiracy with 203 S. Prospect in September 2009.  (*Id.*)

55.    Detective Gurnett was not aware that the only people residing at 203 S. Prospect were an elderly couple.  (*Id.*)

56.    There was no information that either Plaintiff or her husband were involved in any criminal activities   (*Id.*)

57.    There was no specific evidence that guns or weapons were being stored at 203 S. Prospect.  (*Id.*)

58.    Kirt Santistevan had been in custody in Teller County on an unrelated matter from the middle of August 2009 through October 6, 2009.  (*Id.*)

59.    Detective Gurnett's affidavit states that Kirt Santistevan was in custody in Teller County as of September 15, 2009.  (Docket #126-5 at 4.)

60.    Although Detective Gurnett knew Kirt Santistevan was still in custody at the time he prepared the affidavit, his affidavit does not provide Kirt Santistevan's custodial status as of that date.  (Stipulated.)

61.    Despite the fact that Kirt Santistevan was incarcerated, detectives still believed that, based on the totality of the investigation, evidence relevant to the narcotics investigation could be located at 203 S. Prospect.  (*Id.*)

62.     Sergeant Rodgers reviewed the search warrant of 203 S. Prospect and did not have any concerns that the warrant was stale.  (*Id.*)

63.     In addition to Sergeant Rodgers and Detective Gurnett, two superior officers reviewed the warrants for probable cause before Sergeant Rodgers delivered them to Judge Thomas Kane for review.  (*Id.*)

64.     One of the members of the investigative team, Detective Terry Lantz, had a past working relationship with Judge Kane.  (*Id.*)

65.     Judge Kane recalls that he reviewed the warrants and supporting affidavits individually and collectively over a  period of several days and did not find the information provided to be stale.  (*Id.*)

66.     On September 28, 2009, Judge Kane signed the warrants and approved the multiple arrests and searches.  (*Id.*)

    D.     Execution of the Warrants

67.     In planning the execution of the warrants, detectives determined that for the safety of all officers involved, the warrants should be executed simultaneously on October 6, 2009. (*Id.*)

68.     Due to the nature of the investigation and the number of search warrants involved, Metro VNI requested EPSO SWAT to assist by executing the warrant for 203 S. Prospect.  (*Id.*)

69.     After receiving the request to execute the warrant from Metro VNI, EPSO SWAT Sergeant Jeffery Krammer ("Sergeant Krammer") followed standard practices and procedures regarding the use of the EPSO SWAT team.  (*Id.*)

70.     He reviewed the search warrant and accompanying "risk assessment," attended a

9

briefing, and reviewed a written PowerPoint presentation prepared by FBI "Safe Streets" and Metro VNI detectives which outlined the DTO's various players and addresses.  (*Id.*)

71.    The risk assessment included the following information: a copy of the search warrant, initial research– such as County Assessor pages to show who owns the properties–and additional documentation related to potential threats.  (*Id.*)

72.    The additional documentation included a summary of key questions associated with inherent dangers of properties, known associates who pose a risk due to violent criminal histories, and names and addresses of the gang members being investigated.  (*Id.*)

73.    The risk assessment packet also contained information that 203 S. Prospect was a known gang house that was unfriendly to police officers.  This designation required a minimum of three (3) officers to respond to calls for service.  (Docket #126-15, 16.)

74.    203 S. Prospect received its designation as a gang house on March 22, 2007.  (*Id.*)

75.    Sergeant Krammer considered multiple factors when preparing for the warrant execution, including the fact that some of subjects involved in the FBI and Metro VNI briefing session were suspected members of the La Familia gang.  (Stipulated to the extent described below.[3])

76.    Knowing that gangs often use narcotics to support their operations, and they will go to great lengths to protect their efforts, Sergeant Krammer had to prepare himself and his team for the possibility that they could encounter very violent people when assisting with

---

[3]The Court observes that the documents cited in support of County Defendants' assertion do not indicate which of the co-conspirators were involved with the La Familia gang.  However, to the extent Plaintiff concedes that two of the co-conspirators were suspected gang members, the Court finds a modified version of the County Defendants' assertion to be agreeable to all parties.

the execution of the warrants.  (Stipulated.)

77.     Sergeant Krammer considered the possibility that other unknown individuals related to

Kirt Santistevan, including some with criminal histories, might be present during the

execution of the warrant.  (Docket #127-2 at 58.)

78.     Sergeant Krammer knew the Santistevan family was very large and was well-associated

with the La Familia gang.  (Stipulated.)

79.     Sergeant Krammer feared that with all the police activity during the investigation, the La

Familia gang may have gotten notice and were preparing to take action.  (*Id*.)

80.     Based on the risk assessment and his own continued research, Krammer created the

EPSO SWAT "pre-operations" plan.  (*Id*.)

81.     While EPSO SWAT was aware that Kirt Santistevan was in custody, the SWAT team

was unsure of who else would be in the home or what type of resistance it would face.

(*Id*.)

82.     Sergeant Krammer decided that the pre-operations plan would include detonating a flash-

bang device outside of the home to create a diversion from the point of entry.  (*Id*.)

83.     A flash-bang device creates a bright flash and a loud noise.  By design, the device ignites

quickly and gives off very little smoke so as not to hinder the efforts of the officers using

it.  (*Id*.)

84.     The pre-operations plan[4] contemplated that EPSO SWAT Deputies Hess, Miller, Montes,

Krammer, Robblee, Donels, and Gingrich would participate as the "entry team."  (*Id*.)

---

[4]An accurate copy of the pre-operations plan prepared by Sergeant Krammer is filed at
docket #127-11.  (Stipulated.)

85.  Sergeant Krammer briefed the EPSO SWAT team on their respective roles.  (*Id.*)

86.  When creating the pre-operations plan, Sergeant Krammer knew and considered that elderly residents lived at 203 S. Prospect. (*Id.*)

87.  In particular, he was aware that Plaintiff (age 69) and her husband (age 76) were the primary occupants of the home.  (*Id.*)

88.  Based on oxygen tanks left outside of the 203 S. Prospect entrance and a sign warning that oxygen was used in the home, Sergeant Krammer's pre-raid surveillance should have revealed that Plaintiff was on oxygen.  (*Id.*)

89.  Based on Sergeant Krammer's experience, even elderly residents or "petite" women can pose substantial threats to officers.  (*Id.*)

90.  On the morning of October 6, 2009, EPSO SWAT executed a "No Knock" warrant at 1095 Western Drive, another address identified as part of the DTO. During the search, EPSO SWAT located a loaded .45 Caliber Taurus handgun in plain view.  (*Id.*)

91.  EPSO SWAT then arrived on the scene at 203 S. Prospect at approximately 10:28:43 hours on the same day.  (*Id.*)

92.  Upon arriving on scene at 203 S. Prospect, EPSO SWAT discovered that another warrant (736 E. Cucharras, the home of Jorge Perez) a half block away was being executed prematurely, causing concern that EPSO SWAT's own security had been compromised. (*Id.*)

93.  EPSO SWAT deputies approached the door of 203 S. Prospect in a "stack" or tight line for security.  (*Id.*)

94.  At all times EPSO SWAT members were uniformed in clearly marked gear which stated

12

"Sheriff's Office."  (*Id.*)

95.    Each deputy had a pre-identified role.  (*Id.*)

96.    In initiating the knock-and-announce warrant, First Deputy Miller checked the screen door and determined it was locked.  (*Id.*)

97.    Deputy Miller used a hammer-type tool to create a hole in the screen by hitting the screen door.  (*Id.*)

98.    Immediately after, Deputy David assisted Deputy Miller in utilizing a "punch-and-pull" tool which uses a hook mechanism to force open the door.  (*Id.*)

99.    Because Plaintiff's door was relatively sturdy, it took four attempts to pull it open.  (*Id.*)

100.   As Deputies Miller and David were trying to pull the door, Deputy Robblee knocked loudly on the side of the home and shouted "Sheriff's Office, search warrant, open the door now!"  (*Id.*)

101.   Approximately fifteen (15) seconds into the breach, Deputy Owen McCormack detonated a flash-bang device outside of Plaintiff's home.  (*Id.*)

102.   The timing of the flash-bang was critical insofar as its purpose was to distract the occupants while Deputy Gingrich breached the door.  (*Id.*)

103.   The flash-bang awoke Plaintiff from her sleep. (*Id.*)

104.   Because the breach was taking "too long," Sergeant Krammer ordered a "breach and hold," commanding the team members to not enter the home until further order was given.  (*Id.*)

105.   Pages 1 and 3 of docket #127-10 indicate that the flash-bang device was thrown on the side of the residence.  (*Id.*)

106.    The door to the home was breached approximately 12 to 14 seconds after the knock-and-announce procedure began.  (*Id.*)

107.    Sergeant Krammer observed no smoke upon entering 203 S. Prospect immediately after the flash-bang had been detonated.  (*Id.*)

108.    Immediately after the door was breached, EPSO SWAT Deputy Jason Hess (in the front of the "stack") observed Plaintiff, an elderly woman with an oxygen tube.  (*Id.*)

109.    Plaintiff observed the officers holding submachine guns.  (*Id.*)

110.    Deputy Hess initially began to order Plaintiff to come to him; however, because there was glass on the floor and she was barefoot, Hess instead ordered her to remain where she was.  (*Id.*)

111.    Deputies Hess, Montes, Donels, Gingrich, and Krammer entered the home while Deputy Miller remained outside controlling the door.  (*Id.*)

112.    EPSO SWAT team members focused their efforts on securing the premises before answering Plaintiff's questions about why they were there.  (*Id.*)

113.    While the EPSO SWAT team was still securing the premises, Sergeant Krammer immediately directed his attention toward Plaintiff.  (*Id.*)

114.    Sergeant Krammer observed that Plaintiff was having difficulty breathing.  He summoned medical assistance and laid a towel over the broken glass on the floor.  (*Id.*)

115.    According to a call screen report, within two minutes and sixteen seconds after the initial breach of the residence, medical professionals had entered the home and were providing

treatment to Plaintiff.[5]  (*Id.*)

116.    The fear and stress associated with the raid caused Plaintiff to suffer from symptoms

similar to a heart attack.  She remained in the hospital for eight (8) days.  (*Id.*)

E.    Role of Individual Defendants

117.    Detective Gurnett initiated the investigation and participated in procuring the warrant.

He did not participate in the entry of the home during the execution of the warrant.  (*Id.*)

118.    Sergeant Krammer was the EPSO SWAT leader who, at the request of Metro VNI and

the FBI, agreed to use his team to assist in the execution of the multiple search warrants.

(*Id.*)

119.    Deputy Jason Hess was the first deputy to enter the residence at 203 S. Prospect and the

first deputy to observe and direct Plaintiff. (*Id.*)

120.    Commander Ken Moore was serving as the tactical commander for EPSO SWAT on

October 6, 2009.[6]  (*Id.*)

121.    Deputy Owen McCormack detonated the flash-bang device at 203 S. Prospect outside the

home but did not enter the residence during the search.  (*Id.*)

122.    Deputy Marcus Miller was the second member of the breach team during the "stack"

formation and the seventh officer to enter the premises.  After the other six officers

entered, Deputy Miller assisted in securing the premises.  (*Id.*)

123.    Deputy Scott Robblee was the fifth member of the breach team in the "stack" formation

---

[5]Page 2 of docket #127-10 is a fair and accurate photograph of Plaintiff being treated by Fire Department medical personnel on scene.  (Stipulated.)

[6]Although the County Defendants assert Commander Moore served as the tactical commander on October 6, 2006, the Court believes this a typographical error.

and the fourth officer to enter the premises.  (*Id.*)

124.   Deputy John David was assigned to a "containment" role, meaning he would help with

the initial breach but then stay outside of the residence.

125.   Deputy Kimble Gingrich was the seventh member of the breach team in the "stack"

formation and the sixth officer to enter the premises.  He also assisted in the breach of the

door.  (*Id.*)

126.   Officer Jackson Andrews assisted with contacting Jorge Perez at 331 S. Hancock Avenue

on October 7, 2009.  (*Id.*)

127.   After leaving 331 S. Hancock Avenue, Officer Andrews assisted with photographing 736

E. Cucharras Street.  (*Id.*)

128.   Officer Andrews did not assist in the preparation of or seek judicial authorization for the

warrants at issue in this case.

129.   Officers Andrews did not determine the manner or method in which the warrants were

executed.  (*Id.*)

130.   Officer Andrews did not participate in the execution of the warrants on October 6, 2009.

(*Id.*)

131.   Sergeant Rodgers did not participate in the execution of the warrants on October 6, 2009.

(*Id.*)

132.   Sergeant Rodgers did not determine the manner in which the warrants were to be

executed.  (*Id.*)

133.   Sergeant Rodgers has extensive training an experience in making probable cause

determinations for arrest and search warrants. (*Id.*)

134.   Plaintiff does not have evidence showing that the City failed to supervise Sergeant

Rodgers or Officer Andrews.  (*Id*.)

135.   Plaintiff does not have evidence showing that the City failed to train Sergeant Rodgers or

Officer Andrews.  (*Id*.)

F.   Results of the Search

136.   During their search of 203. S. Prospect, officers found no evidence of drugs, guns, or

ledgers related to narcotics or narcotics distribution.  (*Id*.)

137.    The search of 203 S. Prospect was never contested in criminal proceedings, because

neither Plaintiff nor her husband were charged criminally regarding the investigation.

(*Id*.)

138.   A related search of 709 S. Union was contested in criminal proceedings.  The search

warrant for 709 S. Union relied primarily upon the connection of Demetrius Santistevan

to the residence and Demetrius Santistevan's involvement with the drug conspiracy.

Judge Kane signed the warrant on September 28, 2009.  Upon review of the warrant,

District Court Judge Deborah Grohs determined that the information in the warrant was

stale and unreliable, and that the warrant lacked probable cause. Although the parties did

not raise the good-faith exception to the warrant requirement, Judge Grohs further opined

that it would not apply under the circumstances.  (*Id*.)

II.   **Procedural History**

Plaintiff initiated this action on June 23, 2011.  (Docket #1.)  Her claims have evolved

considerably since that time. Plaintiff's initial complaint named several individual officers, two

municipalities, and the United States of America as Defendants.  (*Id.*)  Shortly thereafter,

Defendants City of Colorado Springs and El Paso County moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(6).  (Dockets ##27, 28.)  In response, Plaintiff filed her First Amended Complaint on September 16, 2011, without objection from Defendants.  (Docket #55.) Plaintiff's First Amended Complaint did not include the United States of America, and thus, reduced Plaintiff's claims only to those brought pursuant to Section 1983.  (*Id.*) Following a second motion to dismiss filed by the County Defendants, Plaintiff moved to amend her pleadings once again.  (Dockets ##74, 79.)  Though heavily contested, the Court granted Plaintiff's motion and accepted her Second Amended Complaint as filed.  (Dockets ##104, 106.)

Plaintiff's Second Amended Complaint asserts three claims for relief: (1) a Fourth Amendment claim for excessive force against all Defendants; (2) a Fourth and Fourteenth Amendment claim for unlawful entry against Detective Gurnett and Sergeant Rodgers[7]; and (3) a Section 1983 claim for failure to train and/or supervise against the City of Colorado Springs and Chief Richard Myers.  (Docket #106 at 7-10.)  Pursuant to a stipulation by the parties, Plaintiff dismissed Defendant Michael Shaller on February 23, 2012.  (Docket #112.)

Both the City Defendants and County Defendants filed Motions for Summary Judgment on August 31, 2012.  The City Defendants argue that Sergeant Rodgers and Officer Andrews did not violate Plaintiff's rights and are, therefore, entitled to qualified immunity.  In particular, they contend that the search warrant of 203 S. Prospect was supported by probable cause, was not stale, and was not otherwise tainted by material misrepresentations or omissions.  With respect to

---

[7]Although Plaintiff identifies many additional defendants in describing the second claim, she alleges causation and harm only with respect to Detective Gurnett and Sergeant Rodgers.  (*See* docket #106 at ¶¶ 47,48.)  In that sense, she has not stated a claim for relief against any of the other defendants.

Plaintiff's third cause of action, they note that Plaintiff has provided no facts or evidence to support a claim for failure to train or supervise.

The County Defendants' Motion for Summary Judgment asserts that Detective Gurnett and the officers who participated in executing the warrant are also entitled to qualified immunity. Like the City Defendants, the County Defendants advance extensive argument on the validity of the warrant prepared by Detective Gurnett. Even if the warrant is invalid, the County Defendants argue that the defendants who participated in executing the warrant are entitled to qualified immunity for unlawful entry based on the "good faith" exception to the warrant requirement. With regard to the search, the County Defendants identify reasons why, in their view, the force used was reasonable under the circumstances.  Finally, the County Defendants contend that Plaintiff has failed to demonstrate that each of the individual officers named in Plaintiff's Second Amended Complaint personally violated Plaintiff's constitutional rights during the execution of the search warrant.

Plaintiff's responses to both Motions for Summary Judgment emphasize the deficiencies of the search warrant and the extreme nature of its execution.  However, Plaintiff concedes that she has failed to provide sufficient facts in support of her claims against Officer Andrews, the City of Colorado Springs, and Richard Myers.  Thus, Plaintiff agrees that Defendants Andrews, the City of Colorado Springs, and Richard Myers are entitled to judgment in their favor as a matter of law, and that her third claim should be dismissed.

## RELEVANT LEGAL STANDARDS

### I.     Summary Judgment

Summary judgment serves the purpose of testing whether a trial is required.  *Heideman v.*

19

*South Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003).  The Court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party bears the initial responsibility of providing to the Court the factual basis for its motion and identifying the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which reveal that there are no genuine issues as to any material facts, and that the party is entitled to summary judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  However, the non-moving party has the burden of showing that there are issues of material fact to be determined. *Id.* at 324.

That is, if the movant properly supports a motion for summary judgment, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing a genuine factual issue for trial.  Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original) (citation omitted); *see also Hysten v. Burlington Northern & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002).  These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.'" *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324).  "[T]he content of summary judgment evidence must be generally admissible and . . . if that evidence is presented in the form of an affidavit, the Rules of

20

Civil Procedure specifically require a certain type of admissibility, *i.e.*, the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

## II.     Qualified Immunity

Qualified immunity protects from litigation a public official whose possible violation of a plaintiff's civil rights was not clearly a violation at the time of the official's actions. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It is an entitlement not to stand trial or face the other burdens of litigation. *Ahmad v. Furlong,* 435 F.3d 1196, 1198 (10th Cir. 2006) (internal quotations and citations omitted). The privilege is an immunity from suit rather than a mere defense to liability. *Id.* When a defendant asserts the defense of qualified immunity at summary judgment, the burden shifts to the plaintiff to overcome the asserted immunity. *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009). "The plaintiff must demonstrate on the facts alleged both that the defendant violated his constitutional or statutory rights, and that the right was clearly established at the time of the alleged unlawful activity." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 818 (2009)).

In *Pearson*, the Supreme Court discarded a review process that required courts to examine the elements of qualified immunity sequentially, first considering whether a right had been violated, and then second - if the court concluded a right had been violated - whether that right was clearly established at the time of the alleged violation. 129 S. Ct. at 816-22. *Pearson* retired this process, instead affording courts the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.*

at 818; *see also Christensen v. Park City Mun. Corp.*, 554 F.3d 1271, 1277 (10th Cir. 2009).

## DISCUSSION

All Defendants remaining in this case assert an entitlement to qualified immunity.  Because the qualified immunity analysis includes an evaluation of the merits, the Court will focus its efforts on determining whether Plaintiff has established on supported facts that each of the remaining Defendants violated her clearly established constitutional rights.[8]  Within this broad inquiry, the Court observes two distinct issues and two corresponding categories of defendants.  The first issue is whether the search warrant application presented by Detective Gurnett and Sergeant Rodgers was "so lacking in indicia of probable cause as to render official belief in its existence unreasonable." *Malley v. Briggs*, 475 U.S. 335, 344-45 (1986).  Because the parties agree that Detective Gurnett's and Sergeant Rodgers' involvement was limited to the procurement of the search warrant, the resolution of this question will determine whether they are entitled to summary judgment on both of Plaintiff's remaining claims.  The second issue involves whether the remaining County Defendants employed force that was clearly constitutionally excessive in executing the search warrant.  In the Court's view, the first issue informs the second only to the extent that the officers named in Claim One may have entered Plaintiff's home unreasonably if the warrant was facially deficient or sufficiently lacking in probable cause.  After determining whether the remaining County Defendants were entitled to act on the warrant, the Court will consider whether the methods used in executing the search violated Plaintiff's clearly established constitutional rights. Finally, the Court will determine who may be liable for any resulting violation.

---

[8]Generally, to be clearly established, "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Tonkovich v. Kansas Bd. of Regents,* 159 F.3d 504, 516 (10th Cir.1998).

I.     **Validity of the Search Warrant**

The Supreme Court has recently reiterated that "[w]here the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication the officers acted in an objectively reasonable manner [or with] 'objective good faith.'" *Messerschmidt v. Millender*, 123 S. Ct. 1235, 1245 (2012) (citing *United States v. Leon*, 468 U.S. 897, 922-23 (1984)).   The shield of immunity conferred by the warrant is not entirely impervious; a suit may go forward where the absence of probable cause supporting the warrant "is so obvious that no reasonably competent officer would have concluded that a warrant should issue." *Id.* (citing *Malley*, 475 U.S. at 341).   But "the threshold for establishing this exception is a high one, and it should be." *Id.*   Underlying this highly protective standard is the "sound presumption that the magistrate is more qualified that the police officer to make a probable cause determination." *Id*; *see also United States v. Gonzales*, 399 F.3d 1225, 1228 (10th Cir. 2005) (citations and internal quotations omitted) ("Searches conducted pursuant to a warrant are favored, and, as such, the magistrate's determination that probable cause exists is entitled to great deference."). Once a judge has decided that probable cause exists, the reviewing court's assessment is limited to determining whether the affidavit provided a "substantial basis" for reaching this conclusion. *United States v. Biglow*, 562 F.3d 1272, 1281 (10th Cir. 2009).

In this case, Plaintiff contests probable cause on several bases. At a general level, she disputes whether probable cause *ever* existed to search 203 S. Prospect.  But more particularly, she argues that even if the information contained the affidavit provided probable cause at some point, it had  become stale by the time Sergeant Rodgers presented the search warrant to Judge Kane. Finally, she contends that the affidavit omitted several pieces of information that would have

undermined probable cause if they had been included.  The Court will consider each argument in turn.  In so doing, the Court remains mindful of the high threshold Plaintiff must overcome to hold Defendants liable for a violation of this sort.  *See id.*

    A.    <u>Probable Cause Generally</u>

In determining whether a search warrant is supported by probable cause, a judge must consider whether the totality of the information[9] presented "establishes the fair probability that contraband or other evidence of a crime will be found in a particular place."  *United States v. Roach*, 582 F.3d 1192, 1200 (10th Cir. 2009).  Although the information presented must demonstrate a connection between the place to be searched and the items sought, "this nexus. . .may be established through normal inferences about the location of evidence." *Biglow*, 562 F.3d at 1280.

Though the probable cause inquiry is a flexible one, *see Illinois v. Gates*, 462 U.S. 213, 238-39 (1983), it cannot be satisfied simply by "piling hunch upon hunch."  *Roach*, 582 F.3d at 1200 (quoting *United States v. Valenzuela*, 364 F.3d 828, 897 (10th Cir. 2004)).  Something more concrete is required.  When such facts are provided, a judge may consider "the practical considerations of everyday life" in conjunction with the affidavit to draw his or her own reasonable conclusions as to the likelihood that evidence will be found in a particular place. *Biglow*, 562 F.3d at 1280.

In this case, Defendants rely significantly on the Tenth Circuit's recognition that a person

---

[9]The scope of the information a judge may consider is determining whether there is probable cause is not limited to the four corners of the affidavit presented in support of the warrant sought. *Kaiser v. Lief*, 874 F.2d 732, 735 (10th Cir. 1989).  Rather, the Tenth Circuit has confirmed that a judge may also rely on other materials submitted concurrently with a particular application.  *Id.* Thus, in evaluating whether the warrant to search 203 S. Prospect is valid, this Court may also consider other information submitted in conjunction with the twenty-five (25) warrant applications presented to Judge Kane.

distributing drugs may have evidence of such distribution at his or her residence. *See id.* They note that the affidavit submitted in support of the search warrant application for 203 S. Prospect contained information that a CI had identified Kirt Santistevan as a supplier of methamphetamine, and detectives had witnessed Kirt Santistevan brokering drug transactions between the CI and Luis Vega on two separate occasions. (Docket #127-6, 3.) While Plaintiff does little to dispute Kirt Santistevan's involvement in these transactions, she argues that more was needed to link Kirt Santistevan to the residence. In particular, she asserts that Detective Gurnett's reliance on Kirt Santistevan's representations to police that he lived at 203 S. Prospect should not have been taken at face-value, as Detective Gurnett acknowledged that people involved in criminal activity have a tendency to lie about such matters.

The Tenth Circuit has recognized, in the context of arrest warrants, that individuals involved in criminal activity may live at multiple locations or may provide false information to police regarding their residence. *See Valdez v. McPheters*, 172 F.3d 1220, 1225 (10th Cir. 1999). At the same time, the *Valdez* court made clear that a determination of residence can be made without direct surveillance or the actual viewing of the suspect on the premises. *Id.* at 1226. Although *Valdez* does not speak directly to the matter at hand, the Court is persuaded that it was reasonable for Detective Gurnett to rely on Kirt Santistevan's representations, along with over 20 indicia of residence contained in the Master Index files, in preparing the search warrant for 203 S. Prospect. Detective Gurnett's representations to this effect are sufficient to establish a nexus between Kirt Santistevan's involvement in narcotics distribution and 203 S. Prospect.

In addition to Kirt Santistevan's suspected connection to 203 S. Prospect, Detective Gurnett's affidavit provided several other reasons why drugs or evidence of drug trafficking might

be located at the residence.  First, the vehicle of Luis Vega (who participated with Kirt Santistevan

in two observed drug transactions) made approximately ten (10) stops at 203 S. Prospect between

July 23, 2009, and August 20, 2009.  (Docket #127-5 at 5.)  One of the stops occurred immediately

after Detective Gurnett observed Luis Vega in a suspected drug transaction on July 27, 2009. (*Id.*)

In addition to Vega's contact with 203 S. Prospect, the affidavit included a description of a

telephone call involving the phone of Jorge Perez and the telephone number registered to 203 S.

Prospect.[10]  During the call, an unknown female said, "Yeah we're bugging."  (*Id*. at 4.) According

to Detective Gurnett,  the content of the call and the demeanor of the participants indicated that this

comment was coded language associated with the use of illegal narcotics at 203 S. Prospect.  (*Id.*)


Plaintiff appears particularly concerned that the affidavit relies excessively on the "mere

propinquity" between Plaintiff and her husband's familial relationships with suspected conspirators.

*See Ybarra v. Illinois*, 444 U.S. 85, 91 (1979).  While the Court recognizes the well-established

principle that probable cause cannot be based on familial relationships alone (*see id.*), the affidavit

in  this case does not emphasize or rely on Plaintiff's relationships with anyone. Instead, it explains

(as it is required to) the connection between the co-conspirators and the location of 203 S. Prospect.

Considering Kirt Santistevan's participation in various drug transactions and his self-described

personal connection with 203 S. Prospect,  Luis Vega's frequent contact with 203 S. Prospect, and

suspected drug-related comments made by a woman in the home, the Court finds that there was

probable cause to believe that drugs or evidence of drug trafficking would be found at 203 S.

---

[10]The Court observes a discrepancy between Detective Gurnett's affidavit and the facts agreed to by the parties, as the parties represent that the phone call at issue in the warrant was placed from the phone of Luis Vega. Because significance of the call arises from the statements of the unknown female participant, this discrepancy is not material.

Prospect. Though additional statements regarding Plaintiff's relationship with other co-conspirators may have strengthened a finding of probable cause, the affidavit was sufficient without them. Applying, as the Court must, the requisite degree of deference given to search warrants, the Court finds that there was a substantial basis for the warrant issued by Judge Kane.  At a minimum, Plaintiff has failed to demonstrate that the absence of probable cause was "so obvious that no reasonably competent officer would have concluded that a warrant should issue."*See Malley*, 475 U.S. at 341.

       B.    <u>Staleness</u>

     A search warrant will not be valid unless probable cause to search continued through the time officers filed the affidavit. *United States v. Neal*, 500 F.2d 305, 309 (10th Cir. 1974). While probable cause cannot be based on stale information, the determination of timeliness "does not depend simply on the number of days that elapsed between the facts relied on and the issuance of the warrant." *United States v. Snow*, 919 F.2d 1458, 1459-60 (10th Cir. 1990).  Rather, courts must consider "the nature of the criminal activity, the length of the activity, and the nature of the property to be seized." *Id*. at 1460.

     In *Snow*, the Tenth Circuit recognized that ongoing and continuous criminal activity renders the passage of time "less critical" for purposes of staleness.  *Id*.  The fact that the items sought in *Snow* included records of criminal activity also weighed against a finding of staleness insofar as such records were likely to be kept for some time.  *Id*. Applying *Snow* in the context of ongoing illicit drug trafficking, the Tenth Circuit held that a five-month gap between when the police received tips and when a search warrant was obtained did not render the information stale. *United States v. Myers*, 106 F.3d 936, 939 (10th Cir. 1997).  Under similar facts, the Tenth Circuit has also upheld a search

warrant executed approximately three months after officers acquired information used to obtain the warrant. *Untied States v. Mathis*, 357 F.3d 1200, 1207 (10th Cir. 2004). Delineating the far end of the spectrum, the Tenth Circuit has found that a warrant relying on five-year-old evidence and a defendant's year-old admission of his gang "lifestyle" were too stale to establish probable cause to search for drugs. *Roach*, 582 F.3d at 1201-02 (explaining that it "would stretch the [rule] beyond its breaking point to conclude that an isolated statement, occurring one and a half years before the issuance of the warrant, is evidence that a prior course of criminal conduct is ongoing.").

In this case, Plaintiff contends that even if Detective Gurnett's affidavit provided probable cause for the search at one time, the information had become stale by the time Sergeant Rodgers presented the affidavit to Judge Kane for review. In particular, Plaintiff emphasizes that the last criminal activity involving Kirt Santistevan occurred on April 3, 2009. Additionally, Plaintiff notes that Kirt Santistevan was arrested on August 10, 2009, and remained in jail through the execution of the warrant. In Plaintiff's view, this reduced the likelihood that he continued to use 203 S. Prospect to store drugs.

While Defendants agree with the above facts, they assert that the search warrant for 203 S. Prospect was not based solely on Kirt Santistevan. Rather, Defendants contend that Kirt Santistevan was part of a larger conspiracy engaged in ongoing criminal activity through the middle of September 2009. Defendants note that the arrest warrant for Kirt Santistevan, which Judge Kane reviewed contemporaneously with the search warrant for 203 S. Prospect, indicated that officers had intercepted approximately 648 pertinent phone calls related to Luis Vega and his associates' procurement and distribution of drugs, money, and firearms. (Docket #127-7, 91.) Defendants also cite statements in Luis Vega's arrest warrant regarding plans to expand the organization by

28

establishing new narcotics connections in Mexico.   (*Id*. at 48.)

Considering the entirety of the information presented to Judge Kane, the Court does not find that the search warrant of 203 S. Prospect was based on stale information.  First, Kirt Santistevan's participation in two observed drug transactions creates a reasonable inference that records of drug transactions may be found at his residence. Such records were included among the items sought in the warrant and were not likely to disappear upon his incarceration.  *See Snow*, 919 F.2d at 1460 (recognizing that a defendant's records of criminal activity are "of the type [of items] that would be kept for some time. . .").  In that sense, Kirt Santistevan's incarceration would not have undermined probable cause for the search.  In addition to Kirt Santistevan, Luis Vega's frequent trips to 203 S. Prospect throughout July and August of 2006, including a stop after a suspected drug transaction, suggest that he may have been storing narcotics or cash at the home or distributing narcotics to the residents.  Morever, it cannot be forgotten that Sergeant Rodgers presented the search warrant for 203 S. Prospect in conjunction with over twenty (20) other search and arrest warrants involving a DTO intent on expanding its business. (*See* docket #127-7 at 49.) These warrants place the search warrant for 203 S. Prospect in the context of continuous and ongoing criminal activity involving Kirt Santistevan, Luis Vega, and Jorge Perez, all of whom had connections with 203 S. Prospect.  In light of the nature of the activity, the length of the activity, and the items sought, the Court finds, as in *Snow*, the information supporting the search warrant for 203 S. Prospect was not stale at the time of its presentation to Judge Kane.

C.      Omissions

An otherwise valid search warrant violates the Fourth Amendment if an affiant "knowingly, or with reckless disregard for the truth, include[s] false statements in the affidavit[.]" *Wolford v.*

*Lasater*, 78 F.3d 484, 489 (10th Cir. 1996). Likewise, an affiant who "knowingly or recklessly omit[s] information which, if included, would have vitiated probable cause" also violates the Fourth Amendment. *Id.* Where false information is included, "the existence of probable cause is determined by setting aside the false information and reviewing the remaining contents of the affidavit." *Id.* To determine whether omitted information vitiates probable cause, the court must examine the affidavit as though the omitted information had been included. *Id.* Where sufficient evidence exists to provide probable cause, the inclusion of information disclosing an absence of evidence will not render a warrant invalid. *See Kerns v. Bader*, 663 F.3d 1173, 1188 (10th Cir. 2011) (upholding an arrest warrant which omitted information that a defendant's weapon was not involved in a shooting where "sufficient *other* evidence existed to provide probable cause to think [the defendant] was the shooter. . .") (emphasis in original).

To overcome a defendant's assertion of qualified immunity regarding a Fourth Amendment claim premised on judicial deception, a plaintiff "must make a substantial showing of deliberate falsehood or reckless disregard for truth[.]" *Allen v. Cunningham*, 51 F.3d 285 (table), 1995 WL 143130, *5 (10th Cir. 1995) (citing *Snell v. Tunnell*, 920 F.2d 673, 698 (10th Cir. 1990)). The Tenth Circuit has articulated the two-part test as requiring a plaintiff to (1) present an affirmative showing of dishonesty; and (2) establish that, but for the dishonesty, the search warrant would not have been issued. *Id.*

In this case, Plaintiff alleges that the search warrant for 203 S. Prospect included material misrepresentations and omitted information that would vitiate probable cause. Both alleged deficiencies concern the pole camera placed in Plaintiff's neighborhood during July 2009 to monitor 736 E. Cucharras Street, the home of Jorge Perez. Beginning with the misrepresentations, Plaintiff

takes issue with Detective Gurnett's reliance on the video surveillance in asserting that Vega had "regular contact" with Kirt Santistevan and/or the occupants of 203 S. Prospect. (Docket #127-5.) In contravention of this statement, Plaintiff offers testimony from Detective Gurnett's deposition regarding Kirt Santistevan's arrest in April 2009 and Detective Gurnett's inability to recall, three years after the incident, whether Kirt Santistevan had remained in custody from April to September of 2009. (Docket #127-3 at 31-34.) Additionally, Plaintiff notes that neither Detective Gurnett nor Sergeant Rodgers could recall seeing any member of the conspiracy actually enter the residence at 203 S. Prospect. (*Id*. at 74; docket #127-1 at 22.)

In response to Plaintiff's concern regarding the absence of visual confirmation from the pole camera, Defendants assert that because the pole camera was intended to monitor Jorge Perez's residence, the camera did not capture the entrance to 203 S. Prospect. But, as Plaintiff notes, Detective Gurnett did not document the limited view of the pole camera in his affidavit. Plaintiff believes this omission is material, along with several others. Specifically, Plaintiff objects to Detective Gurnett's failure to state that officers had never observed Kirt Santistevan, Jorge Perez, or Luis Vega enter the residence at 203 S. Prospect. In addition to what the pole camera did not capture, Plaintiff asserts that intercepted phone calls also failed show that any drugs, guns, or records were stored at 203 S. Prospect. Finally, Plaintiff contests the omission of information regarding Kirt Santistevan's incarceration at the time of the warrant application. Had this information been included, Plaintiff believes Judge Kane would not have found probable cause for the search warrant.

Defendants assert that Plaintiff has not presented sufficient information to establish that Detective Gurnett deliberately presented false information or displayed reckless disregard for the truth of the statements contained in the affidavit. At most, Defendants contend that Detective

Gurnett negligently omitted information that would have *bolstered* probable cause, including further details about the date of the phone call to 203 S. Prospect and information describing the quantity and contents of other phone calls between members the DTO. With respect to Plaintiff's specific contentions, Defendants deny that any of the statements were false or misleading. They note that Detective Gurnett never indicated that he saw the conspirators entered the residence at 203 S. Prospect, and stated only that he observed them on the property. Additionally, Defendants assert that Detective Gurnett's statement that "on September 15th, [he] learned that [Kirt Santistevan] was in custody. . ." was not false or misleading as to Kirt Santistevan's custodial status. (*See* docket #127-5 at 4.)

The Court does not agree entirely with Defendants' description of events but is also not persuaded that Plaintiff has met her burden. Turning to the affidavit, the Court is satisfied that Detective Gurnett made clear that the pole camera was intended to capture the home of Jorge Perez, but that the residence at 203 S. Prospect was also in view. (Docket #127-5 at 5.) In light of this capability, Detective Gurnett represented that he was "aware that during the course of the investigation, Mr. Vega has had regular contact with the [Kirt Santistevan] and/or the occupants of 203 [S.] Prospect. . ." (*Id.*) While the Court agrees that Detective Gurnett did not represent that the co-conspirators entered the residence, his statement conveys more than an observation of the co-conspirators on the premises. It implies that the pole camera enabled him to witness some interaction or communication between Luis Vega, Kirt Santistevan, and Plaintiff or her husband. There is no other evidence in the record to suggest this is true. At the same time, Plaintiff has not presented evidence that it is false. She has simply revealed gaps in Detective Gurnett's memory regarding his observations of 203 S. Prospect and Kirt Santistevan during the investigation. This

is not enough to show deliberate falsehood or reckless disregard for the truth.

With regard to the omissions, the Court finds that they do not affect the validity of the warrant because probable cause was not based on, and does not require, an officer's visual confirmation that Kirt Santistevan or any of the co-conspirators entered the home. *See Valdez*, 172 F.3d at 1226. These facts remain: Kirt Santistevan (a known drug broker) listed 203 S. Prospect as his address, Luis Vega (a known distributor of drugs) made frequent trips to 203 S. Prospect, and someone within the home at 203 S. Prospect used coded language indicative of drug use during the time of the investigation. Like the Tenth Circuit in *Kerns*, *supra*, the Court is persuaded that the facts presented in the affidavit established probable cause and that Detective Gurnett was not required to include statements regarding the absence of evidence from particular sources. The fact that the recorded phone calls did not mention 203 S. Prospect would not have undermined the other reasons for believing that 203 S. Prospect may contain drugs or evidence of drug trafficking. Additionally, the Court does not find the absence of any direct reference to 203 S. Prospect unusual, as the Court suspects that those involved in drug trafficking are not inclined to mention specific addresses in their phone calls. Finally, the Court does not find that Detective Gurnett's failure to provide an up-to-the-minute report regarding Kirt Santistevan's incarceration poisons the warrant. Detective Gurnett's assertion that Kirt Santistevan was in custody of as of September 15, 2009, would permit Judge Kane to reasonably infer that his status had not changed within two weeks. Even if Judge Kane did not draw that inference, the reasons for searching 203 S. Prospect were not limited to Kirt Santistevan and would not have vanished simply because Kirt Santistevan was in custody.

Upon review of Detective Gurnett's affidavit and after considering the arguments of all

parties, the Court finds that there was a substantial basis for Judge Kane's finding of probable cause to search 203 S. Prospect at the time Detective Gurnett and Sergeant Rodgers applied for a warrant. Plaintiff has not demonstrated on supported facts that Detective Gurnett deliberately or recklessly presented misleading information or omitted information that would have vitiated Judge Kane's finding of probable cause. Therefore, the Court finds that Detective Gurnett and Sergeant Rodgers are entitled to qualified immunity with respect to Claim Two.

Correlatively, the Court further finds that the officers named in Claim One did not act with excessive force simply by entering the residence. Because Plaintiff has not demonstrated that the search warrant was constitutionally infirm, the Court need not consider whether the good faith exception applies to the remainder of the County Defendants.

## II.     Excessive Force

Officers executing a valid search warrant are still bound by the Fourth Amendment's overarching requirement of reasonableness. In determining whether a particular search or seizure comports with reasonableness, a court must balance "the nature and the quality of the intrusion on the individual's Fourth Amendment interests, against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989)). This inquiry requires a court to consider whether the "the totality of the circumstances justified a particular sort of search or seizure." *Tennessee v. Garner*, 471 U.S. 1, 9 (1985). Relevant factors include "the crime's severity, the potential threat posed by the suspect to the officer's and others' safety, and the suspect's attempts to resist or evade arrest." *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1188 (10th Cir. 2001) (internal quotations omitted). But the assessment is not to be made in a vacuum. Rather, a court must determine reasonableness from the perspective of a reasonable officer in the context in

which the decision was made, recognizing that officers "may be forced to make split-second judgments under stressful and dangerous conditions." *Id*.

Guided by the Tenth Circuit's method of analysis in excessive force cases, the Court will consider each element of force separately to determine whether its use was reasonable under the circumstances. *See id*. at 1189-1194 (taking a segmented approach to excessive force evaluation). Proceeding chronologically, the Court will first evaluate the decision to use a SWAT team to execute the search warrant. Second, the Court will consider the detonation of a flash-bang device on the side of Plaintiff's home. Third, the Court will determine whether the officers' display of firearms was appropriate under the circumstances. Finally, the Court will examine the officers' conduct inside the home, including allegations that they seized Plaintiff for an excessive period of time or stepped on her oxygen tube. After determining where, if at all, excessive force was used, the Court will determine who may be held liable for the violation.

A.   Use of a SWAT Team and Dynamic Entry

In *Holland*, the Tenth Circuit extended Fourth Amendment scrutiny to the planning of an arrest or search by law enforcement, including the decision to use a SWAT team to accomplish a "dynamic entry." *Id*. at 1189. As the *Holland* court recognized, "[t]he decision to deploy a SWAT team to execute a search warrant involves the decision to make an overwhelming show of force–force far greater than normally applied in police encounters with citizens." *Id*. at 1190. Because the reasonableness of a search and seizure depends not only on when a seizure is made, but also how it is carried out, "the decision to deploy a SWAT team to execute a warrant must be 'reasonable' because it largely determines how the seizure is carried out, thereby determining the extent of the intrusion on the individual's Fourth Amendment interests." *Id*. (citing *Garner*, 471 U.S.

at 8).

The court in *Holland* determined that the force invoked by the decision to deploy a SWAT team to effectuate a dynamic entry was not excessive where the deputies executing a misdemeanor arrest warrant planned to encounter several persons in addition to the suspect and believed there would be firearms in the residence. *Id.* at 1191. In the wake of *Holland*, the Tenth Circuit has relied on the same variables in upholding other SWAT team deployments as reasonable. *See Elum v. Schriad*, 46 F. App'x 587, 595 (10th Cir. 2002) (decision to use SWAT team to search residence was reasonable where police knew several adults would be present and firearms had been found in the home "some years earlier").

The Court is aware of, and Plaintiff cites, no cases in which the Tenth Circuit has found that the deployment of a SWAT team to execute a search warrant amounted to excessive force. To the contrary, the Tenth Circuit has intimated that even a blanket policy of sending a SWAT team to execute warrants in all narcotics cases may not offend the Fourth Amendment in the absence of evidence that the decisionmaker "knew the team would use excessive force, intended to cause harm, or instructed the team to use excessive force." *See Whitewater v. Goss*, 192 F. App'x 794, 798 (10th Cir. 2006) (citing *Holland*, 268 F.3d at 1119).

Unlike *Holland*, in which officers used a SWAT team to conduct a search for evidence of a misdemeanor, the search warrant executed in this case sought evidence of felony drug distribution. The suspected crime in this case is also significant in that the items to be seized from 203 S. Prospect (including drugs, records, etc.) could be more easily destroyed than the articles of clothing officers hoped to find in *Holland*. *See Holland*, 268 F.3d at 1198. This required officers to move more swiftly in entering the home. Because the Tenth Circuit has upheld the use of a SWAT team

36

in circumstances where, in the Court's view, its necessity was less apparent, the Court cannot find that Sergeant Krammer violated clearly established law by deciding to use a SWAT team in this case to make a dynamic entry into Plaintiff's residence. The Tenth Circuit's statements in *Whitewater* further underscore this conclusion insofar as they signal a general acceptance of SWAT teams in the context of narcotics investigations. *See Whitewater*, 192 F. App'x at 798.

      B.     Detonation of a Flash-Bang Device

The Tenth Circuit has recognized a Fourth Amendment right be to be free from the unreasonable detonation of a flash-bang device by police. *See Kirk v. Watkins*, 1999 WL 31119, at *3 (10th Cir. June 11, 1999); *see also Myers*, 106 F.3d at 940. Like other methods of force, the court in *Kirk* noted that the reasonableness of detonating a flash-bang device depends on the facts and circumstances of each case. 1999 WL 31119, at *3. Though Tenth Circuit precedent in this area is somewhat sparse, the court has identified several circumstances that both undermine and substantiate the reasonableness of this particular variety of force. In *Myers*, the court found that the use of a flash-bang device was ultimately reasonable where agents knew that the *occupant* had a history of illegal drug trafficking and had spent time in federal prison for a fire bombing incident. 106 F.3d at 940. Similarly, the *Kirk* court held that it was reasonable for officers to use a flash-bang device where: (1) officers suspected the *occupant* to have a number of loaded firearms at his disposal; (2) the *occupant* had previously threatened to kill police officers if they entered his home; (3) the *occupant* had a prior conviction for a violent weapons offense; and (4) the purpose of the warrant was to gather evidence of drug trafficking. 1999 WL 31119, at *3.

In both *Kirk* and *Myers*, the court reached its finding of reasonableness with an apparent degree of reluctance. For example, the use of a flash-bang device in a house where "innocent and

37

unsuspecting children sleep" gave the *Myers* court "great pause." 106 F.3d at 940. The *Myers* court

went on to reject the use of flash-bang devices "as a routine manner." *Id.* Citing this language and

a concurring opinion in *Jenkins v. Wood*, 81 F.3d 988 (10th Cir. 1996), the *Kirk* court advised that

officers who adopt "commando-style tactics" as a standard operating procedure run the risk of

violating the Fourth Amendment. 1999 WL 381119, at *4. Even where an officer's use of a flash-

bang device is warranted, an officer who detonates the device carelessly may violate the Fourth

Amendment. *See id.* (suggesting that an officer who failed to consider the location of occupants

or the presence of flammable objects may have violated the plaintiffs' Fourth Amendment rights).

"Such a rule would be consistent with the [the Tenth Circuit's] precautionary attitude toward the use

of such devices." *Id.* (citing *Myers*, 106 F.3d at 940).

　　In this case, like *Myers* and *Kirk*, officers executing the search warrant on 203 S. Prospect

sought evidence of drug trafficking. Though the Court has found there was probable cause to

support the search warrant, Sergeant Krammer's pre-raid surveillance revealed a number of facts

that, in the Court's view, undermined the need to use "commando-style tactics" in carrying out the

search. In particular, Sergeant Krammer knew Kirt Santistevan was in custody at the time of the

search and that Plaintiff (age 69) and her husband (age 76) were the primary occupants of the home.

Sergeant Krammer had further reason to believe that other persons of danger, including Luis Vega

and Plaintiff's son, John Santistevan Jr., would not be present at the home during the execution of

the warrant. (Docket #127-2 at 83.) There was, however, a possibility that a three-year-old girl

might be present at 203 S. Prospect, as she had been observed at the residence several days prior to

the search. (*Id.*)

　　Echoing Sergeant Krammer, Defendants stress the possibility that other members of the La

Familia gang could have been present during the search. However, the Defendants have not presented any evidence, beyond an attenuated connection between Plaintiff and other co-conspirators, that would support Sergeant Krammer's belief that officers would encounter a dangerous person inside the home at 203 S. Prospect.  Though these facts did not eliminate the possibility that evidence of drug trafficking would be found in the home or that such evidence might be quickly destroyed, they certainly weigh against the reasonableness of detonating a flash-bang device.

Defendants attempt to distinguish this case from the Tenth Circuit's line of decisions in this area by noting that Deputy McCormack detonated the flash-bang device on the side of the home rather than in the residence. While the Court agrees that this is generally less extreme than detonation within a home, the presence of oxygen tanks outside of the home and the use of oxygen inside the home added an element of danger to this decision insofar as oxygen is highly combustible. Additionally, the noise associated with a flash-bang device could prove, as it did it in this case, particularly frightening to a person of advanced age. Finally, there appears to be a dispute between the parties regarding whether or not the flash-bang device produced smoke.  In her deposition, Plaintiff claims that the flash-bang device filled her entire bedroom with smoke.  (Docket #127-4 at 87-88.)  According to Plaintiff, the smoke was so thick that she could neither breathe nor "see anything." (*Id*. at 88.)  Defendants provide a different account of the facts, asserting that Sergeant Krammer did not observe smoke inside the residence upon entry.   In the Court's view, the effect of the flash-bang device, including whether it produced a large volume of smoke, goes to the reasonableness of its use under the circumstances.   In this way, the Court observes a genuine issue of material fact that is appropriately resolved by a jury.  Additionally, based on the stipulated facts,

the Court believes that a reasonable jury could find that the use of a flash-bang device was unreasonable under the circumstances. Therefore, the Court concludes that Defendants are not entitled to judgment as a matter of law regarding this portion of Plaintiff's excessive force claim.

C.    Officers' Display of Weapons

In *Holland*, the Tenth Circuit established that "the display of weapons, and the pointing of firearms directly at persons inescapably involves the immediate threat of deadly force," and may violate the Fourth Amendment if done unreasonably or excessively. *Holland*, 268 F.3d at 1192. The *Holland* court found that continuing to point a loaded firearm at a person who has submitted to the authority of the officer and who otherwise poses no reasonable danger violates the Fourth Amendment. *Id*. at 1193. By contrast, an officer in that scenario "may simply hold[] the weapon in a fashion ready for immediate use." *Id*.

There is no dispute that the officers entering Plaintiff's residence were armed with submachine guns. Plaintiff testified that unnamed officers pointed the guns "downstairs" and said "we're going to shoot[,] we're going to shoot." (Docket #127-4 at 93.) Plaintiff also indicated that one officer stood next to her and "guard[ed]" her with his gun. (*Id*. at 93-94.) However, when asked whether anyone pointed a gun to her head, Plaintiff could not recall. (*Id*. at 94.) It appears from the deposition transcript that the traumatic nature of the incident may have affected Plaintiff's memory. (*See id*. at 95) (Plaintiff: "It was a very big event. That's why I don't remember.").

Defendants have neither argued nor demonstrated that Plaintiff was insubordinate during the execution of the search warrant. In light of Plaintiff's unequivocal compliance, it would have been unreasonable for officers to hold Plaintiff at gunpoint during the search of her residence. But

40

Plaintiff has not presented affirmative testimony that this is what occurred.  To the contrary, the facts show that Sergeant Krammer approached Plaintiff immediately for the purpose of offering her medical assistance.  Though he may have been armed at the time, he did not violate the Fourth Amendment simply by holding his weapon "in a fashion ready for immediate use."  *See Holland*, 268 F.3d at 1193.  It is unclear where in the course of events officers threatened to fire their weapons or pointed them downstairs.  But even assuming these facts as true, Plaintiff has not presented sufficient evidence that such threats were directed at *her*.  In the absence of such evidence, the Court finds that Defendants are entitled to judgment as a matter of law regarding this aspect of Plaintiff's excessive force claim.

D.    Officers' Temporary Seizure of Plaintiff

In *Michigan v. Summers*, 452 U.S. 691, 705 (1981), the Supreme Court held that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted."  This is  particularly true in the context of a search for narcotics, where occupants may engage in sudden violence or make frantic efforts to conceal or destroy evidence.  *Id*. at 702.  In such circumstances, "[t]he risk of harm to both the police and occupants is minimized if officers routinely exercise unquestioned command of the situation."  *Id*. at 702-03.

Plaintiff's Second Amended Complaint asserts that Defendants unlawfully seized and restrained her during the search of 203 S. Prospect.  However, Plaintiff does not claim she was ever restrained using physical force or ordered to stay in a particular place for an extended period of time.  Rather, Plaintiff testified that, for the most part, officers ignored her and refused to answer her questions while they were conducting the search.  (Docket #127-4 at 103.)  On these facts,

41

Defendants argue that officers seized Plaintiff by verbal command for only a brief period in order to secure the premises. Approximately two minutes after Deputy Hess directed Plaintiff to the kitchen, medical personnel arrived to provide Plaintiff with treatment and transport her to the hospital.

In the Court's view, Plaintiff has not presented sufficient facts to demonstrate an excessive period of seizure. Therefore, the Court finds that Defendants are entitled to judgment as a matter of law with respect to this facet of Plaintiff's excessive force claim.

E.   Interference with Oxygen Device

Plaintiff alleges that while executing the warrant, several unknown officers stepped on her oxygen tube, thereby inhibiting her breathing. Defendants note that Plaintiff has failed to identify which officers, if any, are responsible for temporarily interfering with her oxygen device. The Court observes a more significant deficiency, which is the absence of any evidence in the record that officers intended the deprivation Plaintiff alleges.

Section 1983 requires a plaintiff alleging a constitutional violation to demonstrate more than mere negligence. *Daniels v. Williams*, 474 U.S. 327, 333 (1986); *see also Darr v. Town of Telluride, Colo.*, 495 F.3d 1243, 1257 (10th Cir. 2007) ("Negligence is not a basis for liability under § 1983. . ."). The Court does not deny the possibility that officers may have stepped on Plaintiff's oxygen tube while searching her residence. Given the fast-paced investigation and the other potential dangers that required their immediate attention, the Court would not expect the officers to focus excessively on where they placed their feet. But the negligence of their steps, without more, cannot support a constitutional claim. *See id*.

III.   **Liability**

42

As described above, the Court finds that material questions of fact remain with respect to the use of a flash-bang device. On this point, the Court must determine who among Defendants may be held liable under Section 1983.

To hold a SWAT team supervisor liable for alleged the unconstitutional acts of his subordinates, a plaintiff must "demonstrate 'an affirmative link' through facts showing that he actively participated or acquiesced in the constitutional violation." *Holland*, 268 F.3d at 1187 (citing *Winters v. Bd. of Cnt'y Comm'rs*, 4 F.3d 848, 855 (10th Cir. 1993)). This requirement is met where the supervisor personally participates in the violation, exercises control or direction over the offending officers, or fails to adequately supervise those for whom he is responsible. *Id*. Other members of a SWAT team may, of course, be held liable for their own constitutional violations or the constitutional violations of others if they have a meaningful opportunity to prevent the use of excessive force but nonetheless fail to do so. *See Fogerty v. Gallegos*, 523 F.3d 1147, 1163 (10th Cir. 2008) (citing *Jenkins*, 81 F.3d at 995).

In this case, it is undisputed that Sergeant Krammer planned and participated in the execution of the search warrant. He also determined that a flash-bang device should be used and directed Deputy McCormack to detonate the device at a specific time outside of Plaintiff's residence. Thus, the Court finds that Plaintiff has established a sufficient degree of participation on the part of Sergeant Krammer and Deputy McCormack to proceed to trial against those defendants. With respect to the remaining defendants, Plaintiff has not provided enough facts to demonstrate acquiescence. Deputies Marcus Miller, Scott Robblee, John David, and Kimble Gingrich were standing in a "stack" formation preparing to enter Plaintiff's residence at the time Deputy McCormack detonated the flash-bang device. In the Court's view, the necessity of remaining in

formation and focusing on the breach deprived these defendants of a meaningful opportunity to intervene.  Additionally, Detective Gurnett and Sergeant Rodgers were not at the scene and did not participate in the execution of the warrant in any way.  Finally, Plaintiff has not established any personal participation on the part of Ken Moore or Brian Mattson. Therefore, the Court finds Deputies Miller, Robblee, David, and Kimble, Sergeant Rodgers, Detective Gurnett, Ken Moore, and Brian Mattson are entitled to summary judgment with respect to this aspect Plaintiff's excessive force claim.

## CONCLUSION

As described above, the Court finds that Defendants are entitled to summary judgment with respect to Plaintiff's Second and Third claims for relief. Plaintiff herself agrees that Claim Three is deficient, and the Court finds that Claim Two must be dismissed, because the search warrant for 203 S. Prospect was supported by probable cause at the time of presentment and was not rendered invalid by any material misrepresentations or omissions. With respect to Claim One, the Court finds that Plaintiff has demonstrated genuine issues material fact regarding the reasonableness of detonating a flash-bang device during the search of 203 S. Prospect. Sergeant Krammer and Deputy McCormack may be held liable for this use of force, but Plaintiff has failed to demonstrate the requisite degree of personal participation with respect to the remaining County Defendants.  Thus, Plaintiff may proceed to trial for the sole purpose of determining whether Sergeant Krammer and Deputy McCormack violated her Fourth Amendment rights by detonating a flash-bang device outside of her home.  Finding no remaining claims against the City Defendants, the City Defendants' Motion for Summary Judgment [filed August 31, 2012; docket #126] is **GRANTED**,  and the County Defendants' Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56(c) [filed August

31, 2012; docket #127] is **GRANTED IN PART** and **DENIED IN PART** as stated herein.

Dated in Denver, Colorado, this 5th day of February, 2013.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge